**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**DOCKETED**
FEB 2 8 2002

AVERY J. STONE, as trustee of the )
Anita M. Stone Family Trust and the )
Avery J. Stone Trust, )
)
        Plaintiff, )
)
    v. )
)
DAVID J. DOERGE, individually, )
DAVID J. DOERGE d/b/a DOERGE CAPITAL )
MANAGEMENT, and BALIS, LEWITTES & )
COLEMAN, INC., )
)
        Defendants. )

**JUDGE JOAN H. LEFKOW**

Case No.

**02C 1450**

**MAGISTRATE JUDGE KEYS**

Jury Trial Demanded

## COMPLAINT

    Plaintiff, Avery J. Stone as trustee of the Anita M. Stone Family Trust and the Avery J. Stone Trust, by his attorneys, Abramson & Fox, for his complaint against defendants, David J. Doerge, individually, David J. Doerge, d/b/a Doerge Capital Management, and Balis, Lewittes & Coleman, Inc. states as follows:

### Nature of the Case

    1.    This action is brought by the trustee of two express trusts against an investment adviser, registered representative, introducing broker and dealer for violations of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, breach of fiduciary duty, common law fraud, negligent misrepresentation, and accounting in the sale of securities.

126568

## Jurisdiction and Venue

2.      The claims asserted arise under Sections 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77l(a)(2) and 77o, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and  Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5.

3.      Jurisdiction for the federal law claims is conferred upon this Court under 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. § 78aa. Jurisdiction for the other claims is conferred upon this Court under § 1367(a).

4.      Venue lies in this District pursuant to 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. § 78aa because a substantial part of the acts, events, and omissions giving rise to the claims occurred in this District and defendants reside, may be found, or transact business here.

5.      In connection with the acts alleged herein, defendants used, directly or indirectly, the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate telephone communications.

## Parties

6.      Avery J. Stone ("Stone") is a resident of Glencoe, Illinois.  He brings this action as the sole trustee of the Anita M. Stone Family Trust ("Anita Family Trust") and the Avery J. Stone Trust ("Avery Trust")(collectively "Trusts").  The Anita Family Trust and the Avery Trust are express trusts created by trust documents dated April 20, 1972, and September 1, 1979, respectively.

7.      David J. Doerge ("Doerge") is a resident of Chicago, Illinois and does business as Doerge Capital Management ("DCM"). DCM is a division of defendant Balis, Lewittes & Coleman, Inc. and is an investment advisory firm with its principal place of business at 30 South Wacker Drive, Suite 2112, Chicago, Illinois, 60606. Doerge was formerly employed by Goldman Sachs & Company (Goldman Sachs), a New York-based investment banking and securities brokerage firm.

8.      Balis, Lewittes & Coleman, Inc. ("BLC") is a registered broker dealer and investment adviser, member of the National Association of Securities Dealers ("NASD") and the Securities Investor Protection Corporation ("SIPC"), and maintains its principal place of business at 575 Lexington Avenue, New York, New York 10022. BLC maintains an office in this District at 30 South Wacker Drive, Suite 2112, Chicago, Illinois, 60606. Doerge is an agent, associated person, and registered representative of BLC in Illinois.

## Fact Common to All Counts

9.      The Trusts began investing with Doerge as early as 1984 when Doerge was employed by Goldman Sachs. Doerge acted as an investment adviser to the Trusts. Doerge resigned from Goldman Sachs in 1994 and formed DCM. He resigned from Goldman Sachs as a result of customer complaints about improper sales activities and unauthorized transactions.

10.      In late 1994 or early 1995, immediately after his resignation from Goldman Sachs, Doerge began soliciting Trusts for his newly formed investment advisory business, DCM. Doerge solicited Trusts holding himself out as a professional with knowledge and understanding of capital markets and investment principles. As

a direct and proximate result of Doerge's solicitations, and relying on the trust and confidence established over a long-term business relationship with Doerge at Goldman Sachs, Trusts began investing with Doerge through DCM. Stone advised Doerge that the Trusts would only invest in conservative investments, particularly bridge loan funds that made short term, well collateralized loans.

11.    Doerge recommended and sold to the Trusts investments in managed funds, private placements of debt and collateralized bridge loans that involved the use of an intermediary limited partnership ("LP") or limited liability company ("LLC"). Instead of permitting investors to directly invest in the debt of a company, Doerge formed a LP or LLC naming himself as the general partner or managing member. An interest in the LP or LLC was then sold to investors, including the Trusts, anyd the sales proceeds were to be used to invest in private debt or loan transactions on behalf of the newly formed entity.

12.    Through the use of these intermediary LP's or LLC's Doerge was able to control and restrict information regarding the underlying investments from reaching the Trusts and to conceal his receipt of commissions and other payments. The LP's and LLC's also hindered the Trusts from redeeming or withdrawing their investments, and, thus, enabled Doerge to have control and gain profit on the investments without disclosure to the Trusts.

13.    To further induce investment by the Trusts, Doerge told Stone on many occasions that he did not receive a fee for placing the Trusts in a LP or LLC. Doerge told Stone that he was compensated only by a percentage of the profit that the Trusts realized upon the liquidation of their investment. Those representations were false

because Doerge received an "upfront" fee (from 3% to 8%) on most, if not all, investments by the Trusts in his LP's and LLC's. In addition, in order to present himself as a disinterested promoter, Doerge concealed from the Trusts that he received a fee or commission from the recipients (or borrowers) of the funds invested by the LP's and LLC's.

14. Doerge breached his obligations and made false statements to or concealed material facts from Stone about investments in bridge loans and managed funds in order to induce investments by the Trusts. As detailed below, Stone relied upon Doerge's statements to make investments that he would not have made had the statements been truthful.

Doerge TBU Bridge Loan LLC

15. Prior to February 29, 2000, the Anita Family Trust had invested in the Ravi Subramaniam Bridge Loan ("Ravi Bridge Loan"), a short term (90 day) collateralized loan, that performed as agreed and was repaid in a timely fashion. On or about February 29, 2000, Doerge orally offered to Stone an investment in a bridge loan he identified as the "Doerge TBU Bridge Loan LLC." Doerge requested that Stone invest $2,000,000 from the Anita Family Trust and $500,000 from the Avery Trust. Doerge represented to Stone that the purpose of the Doerge TBU Bridge Loan LLC was to make a secured short-term loan to a company called travelbyus.com ("TBU"). Doerge stated that this investment was like the short term, fully collateralized Ravi Bridge Loan and was as "good as gold". Doerge made these statements intending to induce Stone to rely on them. These statements were made by Doerge knowing them to be false.

16.     Relying on Doerge's statements and at his direction, on February 29, 2000, Stone wired $2,000,000 from the Anita Family Trust and $500,000 from the Avery Trust fund to an account at American National Bank purportedly for the benefit of Doerge TBU Bridge Loan LLC. Stone authorized Doerge to invest the funds in the Doerge TBU Bridge Loan LLC.

17.     Doerge provided no documents to the Trusts regarding the $2,500,000 investment until April 2000. On April 24, 2000, Stone received correspondence from Doerge thanking him for the Trusts' $2,500,000.00 investment in "Doerge TBU Bridge Loan LLC" and requested him to sign enclosed subscription agreements and questionnaires. On May 8, 2000, Stone received a facsimile transmission from Doerge, stamped with "URGENT" and "REPLY ASAP", requesting that the subscription agreement signature page and questionnaire for the "investment in Doerge TBU Bridge Loan LLC" be completed, signed and faxed back to him before the end on the following business day so that the Trusts' investments could be secured. Relying on a course of dealings since 1984 and the trust and reliance developed during that time period, Stone signed and faxed back the subscription agreement signature page and questionnaire for each Trust.

18.     From March 2000, to the present, the Trusts received monthly statements from DCM showing an investment of $2,500,000 in a unit of "Doerge TBU Bridge Loan LLC" with annual income of 12%.

19.     In August 2001 Stone became aware that the investment was not a bridge loan or a membership interest in an LLC but instead consisted of series B preferred shares and series C warrants in Aviation Group, Inc., which Doerge acquired

with the $2,500,000 received from the Trusts. Stone, through counsel, confronted Doerge who admitted that the $2,500,000 investment was not a secured short-term loan to TBU but was in equity securities of another company. Stone also learned that the $2,500,000 he wired to Doerge on February 29, 2000, was placed in the DCM account at American National Bank and not in a separate account for Doerge TBU Bridge Loan LLC. On information and belief, Doerge TBU Bridge Loan LLC never was a duly formed LLC.

20. The $2,500,000 investment by Doerge in series B preferred shares and series C warrants in Aviation Group, Inc., which merged into TBU, is substantially worthless today.

21. Doerge concealed the true nature of the investment from Stone and the Trusts in order to induce Stone to transfer funds for the investment for which he received an undisclosed commission. Doerge intentionally misled Stone and the Trusts and wrongfully exploited the long-term investment relationship with Stone for his own gain.

Doerge Capital Collateralized Bridge Fund LP

22. On August 22, 2000, the Anita Family Trust invested $125,000 in the Doerge Capital Collateralized Bridge Fund LP, the investment of which was subject to Doerge submitting to Stone an acceptable investment agreement. Doerge told Stone that the purpose of the this fund was to make 20 to 40 bridge loans structured for the shortest duration possible to reduce risk and increase the potential for higher returns.

23. Earlier in July 2000, Doerge had requested that Stone invest in Doerge Clubhouse LP. It had been formed to make an investment in The Clubhouse . . .

.Where You Belong LLC, which was to develop, own and operate upscale casual "clubhouse" style restaurants in conjunction with retail golf pro shops. Stone declined the request and stated that he did not want to make the investment. Nevertheless and contrary to express direction, Doerge took $125,000 from Doerge Capital Collateralized Bridge Fund LP invested by the Anita Family Trust and made an unauthorized investment in Clubhouse LLC. Doerge did not submit an acceptable agreement to Stone as required.

24. The Clubhouse eventually repaid the $125,000 investment. However, Doerge did not repay the Anita Family Trust's investment as demanded but invested the funds, again without authorization, in Aviation, Inc./TBU in an effort to keep that entity in business.

25. On information and belief, Aviation Inc./TBU is no longer in business and the $125,000 misappropriated by Doerge is lost.

St. James Capital Partners LP

26. On June 30, 1997, on the advice and recommendation of Doerge, the Avery Trust invested $200,000 in St. James Capital Partners, LP ("St. James"). St. James was represented as an investment vehicle by which individuals could invest in collateralized bridge loans to small, under-valued public companies on the verge of merger, acquisition, initial public offering or other event resulting in increased liquidity for the companies.

27. The investments made by St. James were not as represented and proved to be unprofitable. Investments were made in equities and the bridge loans were made with either no collateral or inadequate collateral. The Avery Trust has not

received a return of principal or any interest payment on this investment recommended by Doerge.

28.    St. James and its general partner have been sued by others alleging self-dealing, breach of duty and violations of its own investment guidelines.

29.    Doerge performed no meaningful due diligence investigation of St. James, its general partner, or its affiliates before recommending and advising Stone to invest in St. James.    Doerge held out St. James as a "safe place" to invest and as an opportunity to realize "greater-than market" return at a "lower-than-market risk", a statement that Doerge knew was false or had no basis for believing it to be true.    In addition, Doerge received an upfront fee for placing the Avery Trust investment in St. James which was not disclosed to Stone.

Triune Venture Partners III, LP

30.    On September 1, 1996, on the advice and recommendation of Doerge, the Avery Trust invested $500,000 in Triune Venture Partners III LP ("Triune"). Doerge represented that Triune was formed to make fully secured and collateralized loans to a company developing real estate and building stores for Boston Chicken.

31.    Stone relied on Doerge's statements and believed he had invested in secured loans on real estate and not in equities.  DCM's portfolio appraisal statements as late as 1998 did not reveal that Triune was an investment in stocks.  It was only after Boston Chicken filed for bankruptcy in October 1998 that Stone became aware that the investment was not a secured loan, as represented by Doerge, but was in stock in Boston Chicken.

32.     The stock is worthless and the Avery Trust has lost $460,000 on the investment (it received a distribution of $40,627.23 in July 1998).

Doerge Fortune Financial LLC

33.     On May 18, 1999, on the advice and recommendation of Doerge, the Anita Family Trust invested $500,000 in Doerge Fortune Financial LLC. Doerge represented to Stone that this was a safe bridge loan investment.

34.     The Anita Family Trust has not received a return of principal or any interest payment on this investment and the status of the investment is not known. Despite many request by Stone about the investment, Doerge has failed and refuses to provide information or documents about the investment.

Asian Opportunity Fund

35.     Doerge falsely represented to Stone that the Asian Opportunity Fund, a managed fund, was a safe way of investing in equity securities and the Trusts would earn higher than average rates of return at a lower than market risk. On the advice and recommendation of Doerge, the Avery Trust invested $100,000 on April 6, 1996. Unknown to Stone, and contrary to Doerge's representations, the investment carried enormous risks resulting in a complete loss of the investment.

36. Berkshire Capital Partners, Ltd. ("Berkshire Capital") was the investment manager and sponsor of the Asian Opportunity Fund, David A.X. Baker ("Baker") was its President and Chief Investment Officer, and Doerge was co-director of the fund and solicited its investors. Numerous lawsuits have been filed against Baker, Berkshire Capital and the Asian Opportunity Fund for conversion, breach of contract, unjust enrichment and other federal and state law causes of action, resulting in default

judgements. Baker was indicted by a federal grand jury in the Southern District of New York for securities fraud and wire fraud and pled guilty to the charges on July 11, 2000.

37.    Doerge had a duty to exercise care and conduct a reasonable due diligence investigation before recommending that Stone invest in the Asian Opportunity Fund. As co-director of the Fund, he breached his duty to exercise due care, perform reasonable oversight of Baker's and Berkshire Capital's uses of the Fund's capital and to promptly discover and disclose any wrongdoing by the Fund's co-director. Further, Doerge owed a duty to disclose his co-director interest in the fund to Stone which constituted a conflict of interest.

38.    Doerge breached these duties by failing to perform any meaningful due diligence investigation, failing to monitor, oversee or report upon the activities of Baker and Berkshire Capital, failing to disclose his conflicting interest as co-director of the fund, and repeatedly breached his duties by assuring Stone that the fund was sound.

39.    These breaches of duty proximately cause the Avery Trust to lose its entire investment in the Asian Opportunity Fund.

Other Investments

40.    In addition to the above, on the advice and recommendation of Doerge, the Avery Trust made investments in other entities, such as Doerge Unisource LP, where the status of the investments is not known. Despite many requests by Stone about the investments, Doerge has failed and refuses to provide information or documents about the investments.

## Reliance on Doerge

41.     Based on his 17 year investment relationship with Doerge, Stone unquestioningly relied on Doerge and transferred funds to accounts identified by Doerge without having first been shown, much less signing, the controlling partnership or membership agreement.  Often, Stone wire-transferred the funds requested by Doerge without receiving a private placement memorandum or other offering document or knowing the details of the investment.  Stone relied on Doerge's oral representations concerning the value and profit potential of the investments.

42.     Doerge provided monthly summary portfolio investment valuation reports to Stone regarding the investments and Stone relied on these documents to his and the Trusts detriment because they were often incomplete and misleading.

## Defendants' Wrongful Conduct

43.     Instead of providing Stone with partnership agreements, offering memoranda or other pertinent documents, Doerge persuaded Stone to invest in funds, LLC's, and LP's by means of oral statements which included numerous misrepresentations of material fact, failed to disclose material facts necessary in order to make the statements made not misleading and omitted material facts necessary for Stone to make an informed decision.

44.     In order to convince Stone to invest in the respective investments, Doerge misrepresented that many of these investments were conservative and low risk investments which subjected the Trusts to less risk and volatility and greater than market returns.  Contrary to Doerge's representations, these investments were risky, speculative and unsuitable for trust accounts.

45.     Contrary to Doerge's representations, Doerge engaged in a variety of activities including paying off one investor in a given investment while failing to pay off others, reinvesting the repayment of the investment without authority in either the same or an entirely separate investment, incurring uncollateralized risks and engaging in other unlawful activities.

46.     Doerge, as the managing member or general partner of the LP's and LLC's and as the investment advisor, owed Stone, as an investor, a duty of fair and full disclosure.   Further, Doerge made untrue and misleading disclosures to Stone in his periodic newsletters while acting within the scope as a fund manager, advisor, general partner, managing member, or interested intermediary.

47.     Doerge, DCM, and BLC knew that Stone was relying on Doerge to disclose material information or truthful and not misleading information in making his decision to invest.  Doerge owed Stone a duty of full and fair disclosure since Doerge expressly solicited Stone to invest in the above referenced investments; Doerge knew that Stone was relying on him to disclose material information related to these investments and Doerge had access to detailed information and a duty to perform due diligence investigation prior to advising Stone and recommending investments.

48.     Both DCM and BLC owed Stone a duty of fair and full disclosure because Stone (as trustee of the Trusts) was a brokerage client of BLC and Doerge solicited Stone to make specific investments including those referenced above while acting within the scope of his authority as a registered representative and investment advisory representative of BLC and as an agent responsible for the business affairs of

DCM. Further, BLC was aware or should have been aware that Stone relied on BLC to disclose material information to him when making decisions to invest.

49. Each of the defendants violated its duty to make full and fair disclosures by failing to disclose substantial risks, conflicts of interest, material facts that reasonable due diligence investigation would have revealed, and facts that would have resulted in a different course of action including Stone's choice not to invest.

50. Moreover, defendants did not disclose truthfully to Stone the reasons for Doerge's termination from Goldman Sachs. Doerge was permitted by Goldman Sachs to resign in 1994 following customer complaints that he engaged in improper sales actives and effected unauthorized transactions in customer accounts. This conduct resulted in administrative proceedings against him by the New York Stock Exchange in June 1997. The NYSE imposed a penalty consisting of a censure, a fine of $100,000 and a one month bar from membership in the NYSE, approved person status, and employment with any NYSE member or member organization. In 1997, the Alabama Securities Commission ordered Doerge to show cause why it should not suspend or revoke his registration for having engaged in dishonest or unethical practices in the securities business and later that November, suspended Doerge for 30 days prohibiting him from conducting any business and from being compensated in any way for any business conducted by his clients. In April 1998, the Illinois Securities Department censured Doerge.

COUNT I
Violation of Section 12(a)(2) of the Securities Act

51. Stone realleges paragraphs 1 through 50 as paragraph 51.

52.     Defendants offered and sold to the Trusts various limited partnership and limited liability company memberships, bridge loan, and fund interests that constitute securities within the meaning of the Securities Act and used the means and instrumentalities of interstate commerce, including the mails, e-mails, and interstate telephone calls.

53.     Defendants offered and sold securities to the Trusts by means of oral and written communications of statements of material fact which were untrue or omissions of material facts necessary to make these statements not misleading in violation of section 12(a)(2) of the Securities Act.

54.     Stone did not know and had no reason to know of the untruths and omissions by defendants which caused him to purchase the securities.  Stone would not have purchased the securities had he known the true facts.

55.     As a direct and proximate result of defendants' misrepresentations and omissions of material facts, the Trusts have suffered substantial damages in their purchase of the securities.

### COUNT II
### Violation of Section 10(b) of the Exchange Act

56.     Stone realleges paragraphs 1 through 55 as paragraph 56.

57.     Defendants, singly and in concert, employed a device, scheme, and artifice to defraud the Trusts in establishing managed funds, LP's, LLC's, and bridge loan funds and causing the Trusts to invest in these entities, thereby intentionally, knowingly and recklessly subjecting the Trusts to substantial risks in violation of

Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. The interests of the Trusts in the various limited partnership and limited liability company memberships, bridge loan, and fund interests alleged in the complaint constitute securities within the meaning of the Exchange Act.

58. Defendants had a duty to make full and fair disclosure to the Trusts concerning the investments but failed to do so and engaged in a course of business practices and acts which operated as a fraud and deceit on the Trusts and intentionally and knowingly subjected the Trusts to substantial risks and huge losses. In particular, defendants induced the Trusts to invest $2,500,000 in the "Doerge TBU Bridge Loan LLC" by fraudulently representing it to be a bridge loan fund when Defendants knew that it was not a bridge loan investment but was an investment in securities that are worthless. Likewise, in another act that operated as a fraud and deceit on the Trusts, defendants misrepresented to the Avery Trust that its $500,000 investment in Triune would be placed in secured and collateralized loans when in fact the investment was in equities now worthless. Defendants did not disclose conflicts of interest and compensation they received in placing the Trusts in the investments they recommended.

59. Defendants knew the Trusts' investment strategy was to make conservative investments, particularly bridge loan funds that made short term, well collateralized loans, with little risk to the investments. Defendants had a duty to implement that expressed investment strategy and to adhere to the Fair Practice Rules of NASD and recommend only suitable investments. Defendants repeatedly assured and represented to Stone that the Trusts' investment strategy was being followed.

60.   Defendants breached that duty and, contrary to their representations and with full knowledge, recommended and purchased unsuitable and risky investments in equities and not in short term, well collateralized loans, and waived or amended terms of bridge loans that initially were favorable to the Trusts without their knowledge or consent thereby making them risky and uncollateralized investments.

61.   The Trusts justifiably relied on defendants' misrepresentations and omissions of material facts relating to the securities and the suitability of the securities, and as a direct and proximate result of defendants' wrongful conduct, the Trusts have suffered substantial damages in their purchase of the securities.

COUNT III
Violation of Sections 15 of the
Securities Act and 20(a) of the Exchange Act

62.   Stone realleges paragraphs 1 through 61 as paragraph 62.

63.   Doerge exercised general control over the operation of the managed funds, LP's, LLC's and bridge loan funds including participating in the operation, management (as general partner, manager, or fund manager) and business affairs (including promotion) of these investments. By virtue of his position of control with these investments, he knew that the representations to the Trusts about the investments were false or misleading. Doerge used his authority and power to cause the wrongful acts complained of in this complaint.

64.   Doerge was a "controlling person" within the meaning of section 15 of the Securities Act and Section 20(a) of the Exchange Act and is liable for the unlawful

conduct and violations alleged in this complaint and is liable for the substantial damages suffered by the Trusts in their purchase of the securities.

## COUNT IV
### Common Law Fraud

65.　Stone realleges paragraphs 1 through 50 as paragraph 65.

66.　Doerge made false representations or omitted revealing material facts to the Trusts in order to induce the Trusts to make investments as alleged in this complaint, including specifically the false representations that Triune and the Doerge TBU Bridge Loan LLC were investments in secured and collateralized loans. Doerge made false or misleading statements that he would monitor the investments, provide information regarding the status and true value of the investments, would maintain proper and accurate books and records regarding the investments, would recommend suitable investments given the Trusts' status and investment objectives, would conduct reasonable due diligence investigation before recommending an investment, and that he would not receive up-front commissions or compensation on the investments.

67.　Doerge knew the statements were false and made them to induce Stone to make the investments alleged in the complaint. Stone as trustee for the Trusts justifiably and reasonably relied on defendants' false statements and failure to reveal the true facts and made the investments to the Trusts' detriment.

## COUNT V
### Breach of Fiduciary Duty

68.     Stone realleges paragraphs 1 through 50 as paragraph 68.

69.     Defendants as brokers and investment advisors had a fiduciary relationship, as a matter of law, with the Trusts as investors. The Trusts reposed trust and confidence in the defendants. The fiduciary duties imposed were those of due care, good faith, full and fair disclosure, freedom from conflicts, candor and loyalty. Each defendant owed a duty to Stone and the Trusts to disclose all material facts regarding the investments truthfully and without material misrepresentations or omissions.

70.     Defendants breached their fiduciary duty and exploited the trust and confidence reposed in them by the Trusts by making false and misleading statements or omitting to reveal material facts, purchasing unauthorized securities, making unauthorized investments, misappropriating Trust funds, failing to repay investments, failing to follow instructions and directions, failing to conduct due diligence before recommending an investment, concealing the receipt of upfront fees and commissions in the recommended investments, recommending unsuitable and risky investments, waiving or amending terms of bridge loans that were favorable to the Trusts without their knowledge or consent, and failing to maintain proper records and books and producing them when requested.

## COUNT VI
### Negligent Misrepresentation

71.     Stone realleges paragraphs 1 through 50 as paragraph 71.

72.     Each of the defendants was in the business of providing information to investors such as the Trusts and knew that the information would be used by the investors in connection with making investments. Defendants had a duty to provide complete and accurate information to Stone.

73.     Defendants breached that duty by negligently making the misrepresentations and omissions to Stone in order to induce the Trusts to make the investments alleged in this complaint. Defendants acted carelessly and negligently in ascertaining the truth or falsity of such misrepresentations.

74.     Stone relied on the defendants' information and false statements in making the investments.

COUNT VII
Accounting

75.     Stone realleges paragraphs 1 through 50 as paragraph 75.

76.     The Trusts entrusted the defendants with their funds in a confidential and fiduciary relationship. This imposed a duty on defendants to make an accounting to the Trusts of the funds and investments.

77.     Stone has repeatedly requested defendants to provide an accounting and information about the status and value of the investments. Despite the requests, defendants have failed and refuse to provide the requested information and complete and accurate documents relating to the status of investments.

78.     An accounting is necessary for the Trusts to determine the fate and value of their investments.

WHEREFORE, Stone prays for relief and judgment in favor of the Trusts as follows:

A.     Compensatory damages against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing and unlawful conduct in an amount to be proven at trial;

B.     An accounting of the investments to determine the true value of the investments;

C.     Punitive damages in an amount sufficient to punish and deter defendants;

D.     Interest, both pre-judgment and post-judgment;

E.     Costs, expenses and reasonable attorney's fees;

F.     Imposing a constructive trust over all money and property of the Trusts held by defendants;

G.      Ordering defendants to return the Trusts' funds; and

H.     Such other and further relief as the Court deems just and appropriate.


Dated: February 27, 2002


AVERY J. STONE as trustee of the Anita M. Stone Family Trust and the Avery J. Stone Trust

By _____
One of his attorneys

Of Counsel:

Floyd H. Abramson    (AR# 0006726)
Juris Kins    (AR# 1468405)
Joseph C. Grayson    (AR# 1039997)
Hillary A. Victor    (AR# 6276103)
Abramson & Fox
One East Wacker Drive
Suite 3800
Chicago, IL 60601
(312) 644-8500

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

| | |
|---|---|
| **Plaintiff(s):  AVERY J. STONE, as trustee of the Anita M. Stone Family Trust and the Avery J. Stone Trust** | **Defendant(s):DAVID J. DOERGE, individually, DAVID J. DOERGE d/b/a DOERGE CAPITAL MANAGEMENT, and BALIS, LEWITTES & COLEMAN, INC.** |
| County of Residence: Cook County | County of Residence: Cook County |
| Plaintiff's Atty:   Juris Kins<br>Abramson & Fox<br>One East Wacker Drive, Suite 3800, Chicago, IL 60601<br>(312) 644-8500 | Defendant's Atty: |

JUDGE JOAN H. LEFKOW

02C 1450

MAGISTRATE JUDGE KEYS

II. Basis of Jurisdiction:         **3. Federal Question (U.S. not a party)**

III. Citizenship of Principal
Parties (Diversity Cases Only)
              Plaintiff:- **N/A**
              Defendant:- **N/A**

IV. Origin :                    **1. Original Proceeding**

V. Nature of Suit:              **850 Securities / Commodities / Exchange**

VI.Cause of Action:             **Violations of the Securities Act, the Exchange Act, and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission.**

VII. Requested in Complaint
          Class Action: **No**
      Dollar Demand: **In Excess of $2,500,000.00.**
          Jury Demand: **Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature:

Date:         2/27/2002

Civil Cover Sheet

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**          Revised: 06/28/00

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

CLERK
U.S. DISTRICT COURT

In the Matter of                    Eastern Division        02 FEB 27  PM 3: 36

AVERY J. STONE, as trustee of the Anita M. Stone
Family Trust and the Avery J. Stone Trust v. DAVID J.
DOERGE, individually, DAVID J. DOERGE d/b/a
DOERGE CAPITAL MANAGEMENT, and BALIS,
LEWITTES & COLEMAN, INC.

**DOCKETED**

FEB 2 8 2002  Case Number

FILED - EDS

**02C  1450**



APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

AVERY J. STONE, as trustee of the Anita M. Stone Family Trust and the Avery J. Stone Trust

**JUDGE JOAN H. LEFKOW**

**MAGISTRATE JUDGE KEYS**

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Juris Kins | NAME Floyd H. Abramson |
| FIRM Abramson & Fox | FIRM Abramson & Fox |
| STREET ADDRESS One East Wacker Drive, Suite 3800 | STREET ADDRESS One East Wacker Drive, Suite 3800 |
| CITY/STATE/ZIP Chicago, IL 60601 | CITY/STATE/ZIP Chicago, IL 60601 |
| TELEPHONE NUMBER (312) 644-8500 | TELEPHONE NUMBER (312) 644-8500 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 1468405 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 0006726 |
| MEMBER OF TRIAL BAR? YES ✔ NO | MEMBER OF TRIAL BAR? YES NO ✔ |
| TRIAL ATTORNEY? YES ✔ NO | TRIAL ATTORNEY? YES NO ✔ |
| | DESIGNATED AS LOCAL COUNSEL? YES NO ✔ |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Joseph C. Grayson | NAME Hillary A. Victor |
| FIRM Abramson & Fox | FIRM Abramson & Fox |
| STREET ADDRESS One East Wacker Drive, Suite 3800 | STREET ADDRESS One East Wacker Drive, Suite 3800 |
| CITY/STATE/ZIP Chicago, IL 60601 | CITY/STATE/ZIP Chicago, IL 60601 |
| TELEPHONE NUMBER (312) 644-8500 | TELEPHONE NUMBER (312) 644-8500 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 1039997 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6276103 |
| MEMBER OF TRIAL BAR? YES NO ✔ | MEMBER OF TRIAL BAR? YES NO ✔ |
| TRIAL ATTORNEY? YES NO ✔ | TRIAL ATTORNEY? YES NO ✔ |
| DESIGNATED AS LOCAL COUNSEL? YES NO ✔ | DESIGNATED AS LOCAL COUNSEL? YES NO ✔ |