## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 1450 | **DATE** | 10/15/2002 |
| **CASE TITLE** | Stone vs. Doerge | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' petition to compel plaintiff to arbitrate the issues in the pending complaint [doc. #8-1], and to dismiss [doc. #8-2], or stay the instant litigation [doc. #8-3] is hereby denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 2 | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | OCT 15 2002 date docketed | |
| | Docketing to mail notices. | | | 23 |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 02 OCT 15 AM 7:23 | 10/15/2002 date mailed notice | |
| TH✓ | courtroom deputy's initials | Date/time received in central Clerk's Office | TH6 mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
OCT 15 2002

| | |
|---|---|
| AVERY J. STONE, as trust of the Anita M. Stone Family Trust and Avery J. Stone Trust, ) ) ) ) Plaintiff, ) ) v. ) ) DAVID DOERGE, DAVID DOERGE d/b/a DOERGE CAPITAL MANAGEMENT, and BALIS, LEWITTES & COLEMAN, INC., ) ) ) ) Defendants. ) | No. 02 C 1450<br><br>Honorable Judge Amy J. St. Eve |

## MEMORANDUM OPINION AND ORDER

Defendants Balis, Lewittes & Coleman, Inc., David Doerge, and David Doerge d/b/a Doerge Capital Management Company petition, pursuant to 9 U.S.C. § 1, *et seq.*, for an order compelling Plaintiff Avery J. Stone, as trustee of the Anita M. Stone Family Trust and Avery J. Stone Trust, to arbitrate the issues in Stone's pending complaint against Defendants and to dismiss or stay the instant litigation. For the reasons set forth below, Defendants' petition is denied.

## BACKGROUND

Plaintiff Avery J. Stone serves as the trustee for two brokerage accounts opened with Bear Stearns Securities Corporation ("Bear Stearns") in January 1995: the Anita M. Stone Family Trust and the Avery J. Stone Trust (collectively, the "Stone Trusts"). Avery Stone, as trustee, executed Professional Account Agreements with Bear Stearns for each of the Stone Trusts. Defendant Balis, Lewittes & Coleman, Inc. ("BLC") served as the introducing broker for these accounts, and Bear Stearns acted at the clearing agent for BLC. Defendant David Dorge was an

23

employee of BLC who acted as an investment adviser to the Stone Trusts. Further, Doerge Capital Management is a division of BLC.

In addition to serving as an investment advisor to the Stone Trusts, purchasing and selling securities which were processed and held by Bear Stearns as a clearing agent, Dorge also sold the Stone Trusts private investments involving various limited partnerships or limited liability companies. Bear Stearns did not serve as the clearing agent for these private investment transactions. It is the sale of these private investments that gives rise to this lawsuit.

Stone executed two Professional Account Agreements ("the Account Agreements") with Bear Stearns. The Account Agreements note that each "sets forth the terms and conditions under which subsidiaries of The Bear Stearns Companies Inc. will open and maintain account(s) in your name and otherwise transact business with you." (*See* R. 8-1, Pet. to Compel Arbitration and to Dismiss or Stay Litigation, at Ex. B.) Each Account Agreement mandates arbitration of "controversies arising between you and any Bear Stearns entity *or any broker for which Bear Stearns acts as clearing agent* . . ." (*Id.* at ¶ 24 (emphasis added).) Finally, the Account Agreements provide the "broker and its employees are third-party beneficiaries of this Agreement and that the terms and conditions hereof, *including the arbitration provision*, shall be applicable to all matters between or among any of you, your broker and its employees and Bear Stearns and its employees." (*Id.* at ¶ 9 (emphasis added)).

Defendants petitioned the court to compel arbitration and stay the pending litigation. On July 31, 2002, Judge Lefkow denied the petition to compel and stayed the petition to stay the proceedings. Because the Defendants chose New York under the Account Agreements' forum selection clause and because only a court in the district of the forum where the arbitration will

occur can compel arbitration, Judge Lefkow concluded that she could not compel arbitration. Judge Lefkow, however, granted Defendants' petition for a stay, staying the lawsuit until October 1, 2002.

Defendants subsequently requested that Plaintiff select a forum for arbitration, and Plaintiffs announced that if the Court determined that the dispute was subject to arbitration, they would select the Chicago, Illinois office of the National Association of Securities Dealers as the forum. On August 30, 2002, the case was transferred from Judge Lefkow to this Court by Executive Committee order.

## ANALYSIS

Defendants argue that the Account Agreements require the Plaintiffs to arbitrate the present controversy. Defendants seek to compel the Plaintiff to proceed in arbitration and to stay the lawsuit pursuant to the Federal Arbitration Act ("FAA").

### A. The Applicable Standard

The FAA reflects a "strong federal policy favoring arbitration as a means of dispute resolution." *Morrie & Shirlee Mages Foundation v. Thrifty Corp.*, 916 F.2d 402, 405 (7th Cir. 1990); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625-26, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985) ("'The preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which parties had entered,' a concern which 'requires that we rigorously enforce agreements to arbitrate.'") (citations omitted). Accordingly, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial*

3

*Hospital v. Mercury Construct. Corp.*, 460 U.S. 1, 24-25 (1983).

Even though federal policy favors arbitration, an enforceable agreement to arbitrate must first exist between the parties before the courts can compel arbitration. *Adamovic v. METME Corp.*, 961 F.2d 652, 654 (7th Cir. 1992); *Graphic Communications Union, Local No. 2 v. Chicago Tribune*, 794 F.2d 1222, 1225 (7th Cir. 1986) ("[I]t is equally clear that, since the duty to arbitrate is a contractual obligation, federal courts lack the authority to compel a party to arbitrate in the absence of an agreement to do so."); *see also AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648-49 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986) ("[A]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration.").

When deciding whether to compel arbitration, the court must determine that (1) there is a "valid agreement to arbitrate"; and (2) the "specific dispute falls within the substantive scope of that agreement." *Grundstadt v. Ritt*, No. 96 C 1857, 1996 WL 2197000, at *2 (N.D. Ill. April 26, 1996) (*citing AT&T Technologies*, 475 U.S. at 649, 106 S.Ct. at 1418-19). The interpretation of the contract is a question of law determined by the court. *Florida East Coast Ry. v. CSX Transp. Inc.*, 42 F.3d 1125, 1128 (7th Cir. 1994). In order to determine whether a binding arbitration agreement exists, the court looks to state contract law principles. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1130 (7th Cir. 1997); 9 U.S.C. § 2.

Here, the Agreements provide that New York law shall govern (*see* R. 8-1, Pet. to Compel Arbitration and to Dismiss or Stay Litigation, at Ex. B. at ¶ 23), and thus, the Court will look to New York contract law. Under New York law, before the Court can conclude that a

dispute is subject to arbitration, there must be "evidence affirmatively establishing that the parties expressly agreed to arbitrate their disputes." *Warner v. U.S. Securities & Futures Corp.*, 685 N.Y.S.2d 25, 26 (1999). Where, as here, a party attempts to compel arbitration on an introducing broker, "constructive consent to apply an agreement to arbitrate between a client and the clearance broker to the introducing broker may not be implied 'in the absence of an investor's ***actual intention*** (either express -- i.e., a written or oral statement, or implied -- i.e., from conduct) to be bound by arbitration.'" *Finkel v. D.H.Blair & Co.*, 581 N.Y.S.2d 126, 128 (1992) (emphasis added) (*quoting Shaffer v. Stratton Oakmont, Inc.*, 756 F.Supp. 365, 369 (N.D. Ill. 1991)).

### B.     The Account Agreements

Although it is clear that the Account Agreements include a valid agreement to arbitrate, the parties dispute whether the agreement to arbitrate applies to the underlying controversy that gives rise to this lawsuit. This dispute centers on two paragraphs from the Account Agreements – the arbitration provision itself (Paragraph 24) and the third party beneficiary provision (Paragraph 9).

#### 1.     The Arbitration Provision

Defendants contend that the arbitration provision contained in the Account Agreements applies to the introducing broker and his company -- even for those transactions where Bear Stearns did not maintain the accounts and did not serve as the clearing agent. In support of this position, Defendants rely on Paragraph 24 of the Account Agreements, which mandates arbitration of "controversies arising between you and any Bear Stearns entity *or* any broker for which Bear Stearns acts as clearing agent . . ." (*See* R. 8-1, Pet. to Compel Arbitration and to

Dismiss or Stay Litigation, at Ex. B, ¶ 24 (emphasis added).)

Plaintiff counters that the underlying dispute is not subject to arbitration because the preamble to the Account Agreements suggests that the Account Agreements apply only to Bear Stearns accounts or situations where Bear Stearns acts as clearing agent. (*See* R. 8-1, Pet. to Compel Arbitration and to Dismiss or Stay Litigation, at Ex. B, at p.1 ("This agreement . . . sets forth the terms and conditions under which subsidiaries of the Bear Stearns Companies Inc. will open and maintain account(s) in your name and otherwise transact business with you.").) In addition, Plaintiff argues that the language of Paragraphs 24 confirms that the arbitration provision applies only where Bear Stearns acts as clearing agent or where Bear Stearns is a party to the underlying dispute. Plaintiff cites language from Paragraph 24 suggesting that the arbitration provision applies only to those "controversies arising between you and any Bear Stearns entity or any broker *for which Bear Stearns acts as clearing agent* . . . " (*Id.* at ¶ 24 (emphasis added).)

Based on the language of the arbitration provision, this Court cannot conclude that the parties intended to arbitrate disputes not involving Bear Stearns or disputes where Bear Stearns did not maintain accounts and did not act as clearing agent. The first sentence of Paragraph 24 actually establishes the right to arbitration: "You agree *and, by maintaining accounts for you, Bear Stearns agrees* that controversies arising between you and any Bear Stearns entity or any broker for which Bear Stearns acts as clearing agent . . . shall be determined by arbitration." (*See* R. 8-1, Pet. to Compel Arbitration and to Dismiss or Stay Litigation, at Ex. B. at ¶ 24 (emphasis added).) The explicit reference to "accounts maintained by Bear Stearns" suggests that the controversies that give rise to a right to arbitration must relate to those accounts maintained by

6

Bear Stearns.

Defendants point to subsequent language in Paragraph 24 that refers to arbitration "solely between you and a broker for which Bear Stearns acts as clearing agent" (*id.*), and Defendants argue that this confirms that *all* disputes with such brokers are subject to arbitration. This language, however, does not expand the scope of arbitrable disputes under the Account Agreements. The sentence Defendants cite, like everything in Paragraph 24 after the first sentence, merely clarifies the *procedures* for the arbitration referred to in the first sentence. Indeed, the sentence Defendants cite merely explains the notice requirements for a dispute involving accounts maintained by Bear Stearns but not involving Bear Stearns as a party: "For any arbitration solely between you and a broker for which Bear Stearns acts as clearing agent, such election shall be made by registered mail to such broker at its principal place of business." (*Id.*)

Moreover, as Plaintiff points out, Defendants' argument would prove too much. According to Defendants, because they are broker for which Bear Stearns acted as clearing agent, *all disputes of any kind* between Plaintiff and Defendants are subject to arbitration under the Account Agreements. But the courts have rejected such expansive readings of arbitration provisions as "absurd." *See, e.g., Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1516 (10th Cir. 1995) ("For example, if two small business owners execute a sales contract including a general arbitration clause, and one assaults the other, we would think it elementary that the sales contract did not require the victim to arbitrate the tort claim because the tort claim is not related to the sales contract.").

7

## 2. The Third-Party Beneficiary Provision

In support of their Petition, the Defendants also point to the third-party beneficiary provision in Paragraph 9 of the Account Agreement, which provides that the "broker and its employees are third-party beneficiaries of this Agreement and that the terms and conditions hereof, *including the arbitration provision*, shall be applicable to all matters between or *among any of you, your broker and its employees and Bear Stearns and its employees*." (*Id.* at ¶ 9 (emphasis added).)

Plaintiff counters that the third party beneficiary provision of the Account Agreements applies only where the dispute involves accounts maintained by Bears Stearns and where Bear Stearns acted as clearing agent. Plaintiff notes that the third party beneficiary language appears in a paragraph that is captioned "Clearance Accounts" and that begins, "If any of your account(s) is carried by any Bear Stearns entity *as clearing agent* for your broker . . . " (*See* R. 8-1, Pet. to Compel Arbitration and to Dismiss or Stay Litigation, at Ex. B, ¶ 9 (emphasis added).)

Again, Defendants place too much emphasis on one sentence lifted out of context. It is clear that Paragraph 9 applies only where Bear Stearns maintained accounts or acted as clearing agent for the accounts. For example, Paragraph 9 is entitled "Clearance Accounts." (*See* R. 8-1, Pet. to Compel Arbitration and to Dismiss or Stay Litigation, at Ex. B. at ¶ 9.) Moreover, the paragraph begins with the following language: "If any of your account(s) is carried by any Bear Stearns entity as clearing agent for your broker . . . " (*Id.*)

The inclusion of the third party beneficiary language at the end of Paragraph 9 must be read in the context of the Paragraph as whole. It appears that this Paragraph was intended to clarify the relationship between the client and the broker in those instances where Bear Stearns

8

simply executed the client's trades on instructions from the broker. Thus, this Paragraph explains that unless specifically instructed otherwise, Bear Stearns will accept the broker's instructions for "(a) orders for the purchase or sale of securities and other property in [the client's] account(s) on margin or otherwise and (b) any other instructions concerning [the client's] accounts or property therein." (*See* R. 8-1, Pet. to Compel Arbitration and to Dismiss or Stay Litigation, at Ex. B. at ¶ 9.) Read in this context, the third-party beneficiary language merely confirms that where Bear Stearns has been acting as the clearing agent and a dispute arises between the client and the broker, such disputes are subject to arbitration regardless whether the parties assert a claim against Bear Stearns itself.

This interpretation of the third-party beneficiary language and the arbitration provision is consistent with Bear Stearns' apparent interest in arbitrating all of its disputes under the Account Agreements. For example, this provision would ensure that Bear Stearns could be not forced to defend itself in court in the event that a dispute between the client and the broker produced a claim against Bear Stearns for contribution after a lawsuit had already been filed. Of course, this hypothetical scenario would be possible only where the dispute involved accounts that Bear Stearns maintained or where Bear Stearns acted as clearing agent. In this case, the dispute involves investments that had nothing to do with Bear Stearns.

Thus, it is clear that while the parties agreed to arbitrate certain disputes -- namely, those involving accounts maintained by Bear Stearns or accounts where Bear Stearns served as clearing agent -- the parties did not agree to arbitrate all disputes between the client and the broker. *Cf. PaineWebber Inc. v. Chase Manhattan Private Bank (Switzerland)*, 260 F.3d 453 (5th Cir. 2001) ("Certainly, the extremely broad language of these clauses, if read in a vacuum, would appear to

bind the parties to arbitrate any and all disputes that may arise between them. When read in context as they must be, however, the reach of the arbitration clauses in the Option Agreements is simply not capable of such an expansive grasp."); *Universal Am. Corp. v. S.S. Hoegh Drake*, 264 F.Supp. 747, 751 (S.D.N.Y. 1966) ("The mere fact that parties have agreed to arbitrate controversies of a certain class or type obviously does not require them to arbitrate disputes in an entirely different category arising under different documents."). Because the present controversy does not involve such accounts, it does not fall within the scope of the arbitration provision.

## CONCLUSION

Because the accounts at issue in this lawsuit are not covered by the arbitration provision from the Account Agreements, Defendant's petition to compel arbitration is denied.

Dated: October 15, 2002

ENTERED:

_____
AMY J. ST. EVE
United States District Court Judge